IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **LEADERS OF TOMORROW YOUTH CENTER, INC.**<br>1120 North Charles Street<br>Suite 500<br>Baltimore, MD 21201<br><br>           *Plaintiff*,<br><br>      v.<br><br>**DERMELL BRUNSON**<br>7111 Tanager Avenue,<br>Glen Burnie, MD 21060.<br><br>      and<br><br>**DANA CARR**<br>611 Brune Street,<br>Baltimore, MD 21201.<br><br>           *Defendants*. | Civil Action. No. |

## COMPLAINT

Plaintiff, The Leaders of Tomorrow Youth Center, Inc. ("LTYC") sues Defendants, Dermell Brunson and Dana Carr, and states as follows:

## PARTIES

1. LTYC is a 501(c)(3) non-profit corporation incorporated in the State of Maryland, with its principal place of business located in Baltimore City, Maryland. LTYC supports youths, ages 5-18, in the state of Maryland, with programs that empower them to excel in the arts, academics, and social development.

2. Dermell Brunson is a resident of Anne Arundel County, residing at 7111 Tanager Avenue, Glen Burnie, MD 21060.

3. Dana Carr is a resident of Baltimore County, residing at 611 Brune Street, Baltimore, MD 21201.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

5. This Court has personal jurisdiction over Defendants because they are residents of the State of Maryland.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Baltimore City, Maryland.

## GENERAL ALLEGATIONS

7. LTYC is a nonstock corporation originally incorporated in 2006. It enriches the lives of underserved youth in the Maryland school systems through arts education programming.

8. Pursuant to its Bylaws and Section 2-401 of the Corporations and Associations Article of the Maryland Annotated Code, LTYC's business and affairs are managed by a Board of Directors.

9. Section 2.03 of LTYC's Bylaws states, "At each annual meeting, the directors shall elect directors to hold office until the next annual meeting and until their successors are elected and qualify." *See* **Exhibit A**.

10. Brunson served on the Board of Directors until December 16, 2021 and was employed as President of LTYC until April 22, 2022.

**Brunson Disrupted LTYC's Business Operations**

11. In 2021, the Board learned of numerous, serious actions taken by Brunson that were improper under LTYC's bylaws and that circumvented the Board's authority.

12. Without consulting the Board, Brunson unilaterally increased the compensation and salary for himself and Carr, the corporation's Executive Director.

13. Brunson's actions violated Section 4.09 of the Bylaws, which gives the Board the sole power to set the compensation for LTYC's officers. The Board did not authorize Brunson to increase any salaries.

14. The Board expressed concern to Brunson that he had sidestepped the Board's authority and approved a raise for his own personal benefit. Brunson refused to acknowledge the Board's concerns or authority.

15. Section 2.04 of the Bylaws provides, "Unless a statute or the Articles of Incorporation provide otherwise, the directors may remove any director, with or without cause, by the affirmative vote of a majority of the entire Board." *See* **Exhibit A**.

16. Because of Brunson's actions, by letter, the Board told Brunson that he must choose between serving as a Director on the Board, and serving as President and a paid employee of LTYC; he could not continue in both roles. *See* Letter to Brunson attached as **Exhibit B**.

17. Brunson never responded to the Board's letter or to the options presented to him. Because of his continued defiance of the Board's authority, pursuant to its powers under Section 2.04 of the Bylaws, the Board removed Brunson as a Director by unanimous vote at its December 16, 2021 meeting. *See* Letter to Brunson removing him as Director attached as **Exhibit C** and LTYC's December 16, 2021 Meeting Minutes attached as **Exhibit D**.

**The Board Removes Brunson As President**

18. The Board agreed to hold a virtual Board meeting on February 17, 2022. However, when the Board contacted LTYC's Executive Administrator, Lauren Blackwell, to coordinate the meeting, she refused to cooperate because Brunson had told her that LTYC was only to hold physical meetings from then on, with "100% Board attendance." She stated in an email, "Board Development is happening out of order, and not attached to the leader/recruiter." Brunson had no authority under the Bylaws or Maryland law to dictate the time and place of Board meetings. *See* email to Board members attached as **Exhibit E**.

19. On February 17, 2022, Brunson wrote a letter to the Board calling for the entire Board's resignation, stating that he was acting in his "role as Founder & President of LTYC and Chief Visionary of it's [*sic*] corporate organization and Board structure, to protect the vision." *See* Letter to the Board from Brunson attached as **Exhibit F**. Brunson had no authority under the Bylaws or Maryland law to make this demand.

20. None of the LTYC Directors submitted their resignations in response to Brunson's letter.

21. When the Board refused to resign, Brunson stopped communicating with the Board and stated that any further correspondence from the Board would be "viewed as aggressive, harassment and intent to sabotage the work of LTYC." *See* **Exhibit F**.

22. Because of his complete unwillingness to take direction from the Board or even to communicate with them, at the Board's April 21, 2022 meeting, the Board of Directors unanimously voted to remove Brunson as an officer of LTYC and terminate his employment as President. The Board took this action under Section 4.08 of the Bylaws and Section 2-413(c)(1) of the Corporations and Associations Article of the Maryland Annotated Code.

23. The Board memorialized this decision in a resolution and notified Brunson of its decision in a letter dated April 22, 2022. A copy of the resolution is attached hereto as **Exhibit G** and the termination letter is attached hereto as **Exhibit H**.

24. Also at the April 21, 2022 Board meeting, pursuant to Section 4.01 of the Bylaws, the Board appointed Chair of the Board, Dr. Kadri Webb, to be the CEO and COO of LTYC. *See* a copy of the resolution attached as **Exhibit I**.

**The Board Removes Carr As Executive Director**

25. The Board informed Carr that it had terminated Brunson in a telephone call on April 21, 2022 and by letter the following day. The letter stated that, as an officer of LTYC, Carr was expected to act on LTYC's behalf and at the direction of the Board. The letter further directed that Carr must ensure that Brunson no longer had access to LTYC's property and computer systems. *See* a copy of the letter to Carr attached as **Exhibit J**.

26. Carr had previously been granted administrative access to LTYC's email account with the domain "ltyc.net" within the scope of her employment with LTYC.

27. After terminating Brunson, Dr. Webb instructed Carr to revoke Brunson's email and computer access since he was no longer employed by the Company or otherwise authorized to access them.

28. Carr refused to follow Dr. Webb's instruction, citing her "personal relationship" with Brunson.

29. Because of her insubordination, the Board terminated Carr's employment with LTYC.

30. The Board passed a resolution memorializing this decision on April 27, 2022 and notified her by letter the same day. *See* a copy of the resolution removing Carr attached as **Exhibit K** and the Board's letter notifying Carr of her termination attached as **Exhibit L**.

31. The Board explicitly notified Carr in the termination letter that she was no longer authorized to access any LTYC property, "including but not limited to bank accounts, financial records, intellectual property, or computer systems, or to enter any company premises." *See* **Exhibit L**.

**Defendants Are Unlawfully Accessing LTYC's Computer Systems**

32. Since their termination, Defendants have continued accessing LTYC's business email account without authorization.

33. LTYC utilizes Google as its email service provider for its email account with the domain "ltyc.net." LTYC authorizes its employees, officers, and Board members to utilize LTYC email accounts for business purposes.

34. Because Carr was the only person with administrative access to the email account with Google, LTYC cannot remove Defendants' email access and prevent them from sending unauthorized emails.

35. As a result, Defendants continue to send emails using the company's email system, causing substantial damage to LTYC's business.

36. After the Board terminated Defendants' employment, Dr. Webb sent an email to LTYC's business partners attaching a letter informing them that Defendants had been removed from their positions and had no authority to act on LTYC's behalf. *See* a copy of the letter attached as **Exhibit M**.

37. On April 30, 2022, Defendants unlawfully, and without authority, accessed LTYC's email account, info@ltyc.net, and sent an email to LTYC's business partners, claiming that LTYC had "endured a breach of security with our partner files, and we are currently experiencing hacking including false and fraudulent information being communicated by unauthorized and unofficial individuals." The email was signed by Brunson as "Interim Chair, Founder, President & Principal of LTYC, Inc." and by Carr as "Executive Director." It further instructed LTYC's partners to "disregard any suspicious email you may receive, and please only exchange dialogue with previously communicated, approved personnel." *See* a copy of the email from Defendants to LTYC business partners attached as **Exhibit N**.

38. As terminated employees, Defendants were no longer authorized to access LTYC's email account.

39. As a result of Defendants' email, Dr. Webb received a flood of emails from LTYC's business partners who were confused and suspicious about the content of the email. To restore their confidence in LTYC and maintain their partnerships, Dr. Webb spent significant time speaking with LTYC's business partners, individually, to try to repair the damage caused by Defendants.

40. Upon information and belief, many of LTYC's partners believed Defendants' false representations in the email and continue to communicate with Defendants about business transactions with LTYC.

41. LTYC's Board has also spent significant time investigating and attempting to remedy the security breaches caused by Defendants' unauthorized access to its computer systems. This included, but was not limited to, contacting Internet service providers to determine how to remedy the breaches, and retaining counsel to represent the company's interests.

42. On May 10, 2022, using a company email address, Carr emailed an LTYC business partner, Prince George's County Public Schools, requesting payment of LTYC invoices. See email attached as **Exhibit O**. As a terminated employee, Carr had no authority to conduct business on LTYC's behalf with its business partners. LTYC has instructed Defendants to cease and desist representing that they are still employed by, and authorized to represent, LTYC. LTYC sent cease and desist letters to Defendants on May 5, 2022 and again to their counsel on May 16, 2022. However, Defendants have continued their unlawful conduct and caused further damages to LTYC.

### Defendants Have Unlawfully Blocked Plaintiff From Accessing Its Own Business And Financial Accounts

43. In addition to improperly sending emails on behalf of LTYC, Defendants have also prevented LTYC and its Board from accessing their own business and computer accounts, causing significant financial harm to LTYC.

44. On May 14, 2022, LTYC learned that, after his termination, Brunson borrowed money against LTYC's line of credit with TD Bank and also withdrew $30,000 from LTYC's bank account. *See* correspondence between Dr. Webb and TD Bank attached as **Exhibit P** and TD Bank transaction records attached as **Exhibit Q**. As a former employee of LTYC, Brunson had no authority to do so.

45. In addition to making the unauthorized loan and withdrawing money from the company's TD Bank account, Defendants have also blocked the Board's and LTYC's access to its other bank accounts held with M&T Bank and Bank of America by falsely instructing these banks that only Defendants have lawful access to the accounts.

46. On April 25, 2022, Dr. Webb obtained credentials to access LTYC's financial management accounts: billcom, tallie, and QuickBooks Online accounts.

47. Nine minutes later, and two days before her termination, Carr deleted Dr. Webb's Intuit QuickBooks access. She also unlinked LTYC's bank accounts from QuickBooks, so that Dr. Webb was unable to view any of LTYC's banking transactions through QuickBooks. *See* screenshot from QuickBooks showing user activity attached as **Exhibit R**. Neither Dr. Webb nor any other member of the Board authorized Carr to do so. Subsequently, Intuit emailed Dr. Webb and stated, "We were contacted by another person who asserted that they are the rightful owner of this account. They have submitted documentation to us to verify ownership, and it passed our review process. Therefore, that person has been granted Master Administrator access rights to the account, and you are no longer the Master Administrator." *See* email correspondence from Intuit, attached as **Exhibit S**. Without Master Administrator access, Dr. Webb is unable to undo the changes Carr made to the account.

48. Defendants have also unlawfully prevented LTYC from accessing its benefits accounts. Dr. Webb contacted LTYC's insurance broker, Schoenfeld Insurance, to notify them of Defendants' termination and to gain access to LTYC's benefits account. He also instructed Schoenfeld to terminate Defendants' benefits as they were no longer employees and did not qualify for coverage. *See* email communications between Dr. Webb and Schoenfeld attached as **Exhibit T**.

49. Subsequently, Carr contacted Schoenfeld and falsely stated that Defendants had not been terminated. As a result, Schoenfeld restored Defendants' benefits coverage despite Dr. Webb's explicit instructions to terminate their benefits. Dr. Webb's benefits account credentials were then deleted, and he could no longer access or make changes to LTYC's benefits account. *See* **Exhibit T**.

**Defendants Created Fraudulent Corporate Documents To Support Their False Claim Of Authority**

50. To support their scheme to steal control of LTYC, Defendants created a document purporting to be an amendment to LTYC's corporate charter (the "Fraudulent Amendment"). *See* copy of the alleged amendment to corporate charter, attached as **Exhibit U**. The Fraudulent Amendment was never approved by LTYC's Board and contains false representations, purportedly made under penalty of perjury. Defendants then sent this fraudulent document to LTYC's insurance broker.

51. The Fraudulent Amendment states that the Board of Directors "haven't officially been officers of LTYC or given any power or authority to represent the organization externally, only internally for onboarding purposes." *See* **Exhibit U**.

52. Maryland's SDAT website shows no record of this Fraudulent Amendment.

53. Upon information and belief, Defendants have provided this Fraudulent Amendment to other LTYC vendors and partners to falsely claim that they are authorized to act on LTYC's behalf.

54. Defendants have also falsified a document purporting to be LTYC's bylaws, dated February 26, 2022 (The "Fraudulent Bylaws"). *See* a copy of the February 26, 2022 document attached as **Exhibit V**.

55. The Fraudulent Bylaws are signed by only Brunson, and LTYC's Board has never approved the Fraudulent Bylaws or even seen a draft of them until Defendants asserted they were the actual bylaws of the company.

## COUNT I – VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
## 18 U.S.C. § 1030

56. Plaintiff incorporates Paragraphs 1-55 as though they were fully set forth herein.

57. Defendants intentionally accessed LTYC's email accounts after they were terminated from their employment and used LTYC's email accounts to send emails to LTYC's business partners falsely claiming that they were still employed.

58. Defendants' email account was connected to the Internet and was therefore a "protected computer" for purposes of 18 U.S.C. § 1030(A)(5)(C).

59. Defendants did not have authorization to access LTYC's email accounts after they were terminated.

60. LTYC has suffered loss or damages exceeding $5,000 as a result of Defendants' conduct, including the costs Plaintiff has incurred to determine the extent of Defendants' violations of the Computer Fraud and Abuse Act, as well as loss of revenue and loss of business goodwill.

61. Defendants' conduct is a violation of the Computer Fraud and Abuse Act.

62. Defendants' ongoing illegal and tortious conduct will irreparably harm Plaintiff, unless Defendants are permanently enjoined from engaging in such wrongful conduct.

63. No adequate remedy exists at law to protect Plaintiff from the results of the Defendants' wrongful conduct.

WHEREFORE, Plaintiff requests that this Court:

   a. Enjoin Defendants from accessing any LTYC computer systems, including the LTYC.net email account;

   b. Award compensatory damages in an amount to be determined at trial;

   c. Award Plaintiff such other and further relief as may appear just and proper.

## COUNT II – VIOLATION OF THE STORED COMMUNICATIONS ACT
### 18 U.S.C. § 2701

64. Plaintiff incorporates Paragraphs 1-55 as though they were fully set forth herein.

65. Defendants intentionally accessed LTYC's email account after they were terminated from employment.

66. LTYC's email account is in electronic storage on Google's servers, which are facilities through which electronic communication services are provided.

67. Defendants were not authorized to access LTYC's email account after they were terminated.

68. LTYC has been damaged by Defendants' conduct because LTYC's Board was required to spend significant periods of time investigating and attempting to remedy the unauthorized access of LTYC's email account.

69. This included contacting their vendors and business partners individually after Defendants falsely claimed that they continued to be employed by LTYC, and contacting Internet service providers to determine how to remedy the breach.\

70. LTYC has also been damaged by Defendants' conduct because it has lost profits and business goodwill.

71. Upon information and belief, Defendants continue to use LTYC's email account to collect and exercise control of funds that are owed to LTYC and engage in other unauthorized financial transactions involving LTYC.

72. Through Defendants' actions alleged above, Plaintiff suffered actual damages.

73. Defendants' conduct described herein was willful and intentional.

74. Defendants' ongoing illegal and tortious conduct will irreparably harm Plaintiff, unless Defendants are permanently enjoined from engaging in such wrongful conduct.

75. No adequate remedy exists at law to protect Plaintiff from the results of the Defendants' wrongful conduct.

WHEREFORE, Plaintiff requests that this Court:

a. Enjoin Defendants from accessing any of LTYC's electronic communications as defined under the Stored Communications Act, including the LTYC.net email account;

b. Award compensatory damages in an amount to be determined at trial;

c. Award punitive damages in an amount to be determined at trial;

d. Award Plaintiff their reasonable expenses, including reasonable attorneys' fees and costs, incurred in connection with seeking this relief; and

e. Award Plaintiff such other and further relief as may appear just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY

76. Plaintiff incorporates Paragraphs 1-55 as though they were fully set forth herein.

77. Defendants, as corporate officers and employees of LTYC, owed LTYC a fiduciary duty to act solely for the benefit of LTYC as to all matters within the scope of their positions and employment with LTYC.

78. Brunson breached his fiduciary duty by demanding the Board's resignation with no legal basis, and by cutting off communication with the Board as of February 2022, effectively crippling LTYC's ability to carry on business.

79. Brunson also breached his fiduciary duty by creating the Fraudulent Bylaws.. Brunson knowingly created the Fraudulent Bylaws with provisions that would benefit him personally, in an attempt to usurp the Board's authority and falsely claim of control over LTYC.

80. Carr breached her fiduciary duty when she refused to follow the explicit instructions of the Board following Brunson's termination, and took steps to prevent the Board from accessing LTYC's own property, including its benefits accounts and bank accounts.

81. As a result of Defendants' wrongful conduct, Plaintiff has suffered damages.

WHEREFORE, Plaintiff requests that this Court award compensatory damages in an amount to be determined at trial.

### COUNT IV – CONVERSION

82. Plaintiff incorporates Paragraphs 1-55 as though they were fully set forth herein.

83. LTYC maintains a Line of Credit ("LOC") with M&T Bank in the amount of $149,364.71. On May 11, 2022, Brunson withdrew $30,000 from the LOC by having the funds transferred from the LOC to LTYC's savings account.

84. The LOC is maintained by LTYC for the purpose of quick access to funds to support LTYC's charitable activities. The savings account is not an operating account as LTYC has a separate checking account it uses for those purposes. LTYC has the ability to track the amount of money going into and out of the savings account. The funds at issue are identified on the banking statement showing the transfer from the LOC to the savings account, going out of the account via a check issued by M&T Bank, and on the withdrawal slip completed by Brunson.

85. Defendants currently exercise dominion and control over the $30,000.

86. Plaintiff is entitled to immediate possession of the $30,000.

WHEREFORE, Plaintiff requests that this Court award compensatory damages in an amount to be determined at trial.

### COUNT V – DECLARATORY JUDGMENT

87. Plaintiff incorporates Paragraphs 1-55 as though they were fully set forth herein.

88. Defendants' conduct in continuing to access LTYC's property and financial accounts after their termination, and falsely representing that they are authorized agents of LTYC, has harmed LTYC's ability to operate the business.

89. A present controversy exists as to whether Defendants or the Board of Directors are authorized to manage and direct LTYC.

90. A present controversy exists as to whether LTYC's Bylaws are valid.

91. Plaintiff requests that this Court declare that LTYC's Bylaws are valid.

92. Plaintiff further requests that this Court declare that any other documents purporting to be LTYC's bylaws be declared invalid.

93. Plaintiff requests that this Court declare that the Board of Directors of LTYC is authorized to manage and direct LTYC.

94. Plaintiff requests that this Court declare that Defendants Brunson and Carr have been removed as LTYC's officers.

95. Plaintiff requests that this Court declare that Defendants Brunson and Carr were terminated from their employment with LTYC.

### COUNT VI - PERMANENT INJUNCTIVE RELIEF

96. Plaintiff incorporates Paragraphs 1-55 as though they were fully set forth herein.

97. The Defendants' ongoing illegal and tortious conduct will irreparably harm Plaintiff, unless Defendants are permanently enjoined from engaging in such wrongful conduct.

98. Defendants have illegally accessed LTYC's bank accounts and withdrawn money, and have fraudulently concealed their illegal actions by blocking Plaintiff from accessing its own accounts.

99. Defendants have fraudulently held themselves out to be representatives of LTYC by unlawfully accessing LTYC's email accounts without authorization and using them to send out emails to unlawfully engage in financial transactions on LTYC's behalf. Defendants have refused

to surrender their log-in information, so Plaintiff is unable to remove Defendants' access to Plaintiff's computer systems.

100. Defendants have refused to surrender LTYC's property after being terminated as LTYC demanded in the termination letters.

101. Defendants have fraudulently obtained insurance benefits to which they are not entitled, by fraudulently claiming to Plaintiff's insurance broker that they were still employed by LTYC.

102. Defendants have created and transmitted false documents to assist them in representing that they are authorized to act on LTYC's behalf, including a fake set of LTYC bylaws.

103. No adequate remedy exists at law to protect Plaintiff from the results of the Defendants' repeated attempts to gain or maintain access to LTYC's business and financial information.

104. The full extent of the harm Defendants have inflicted on Plaintiff is still unknown, given their relentless attempts to block the Board from accessing LTYC's own business and financial information.

105. There is a substantial likelihood that Plaintiff will prevail on its claims in this action.

106. The hardships on Plaintiff if injunctive relief is denied heavily outweighs any harm to Defendants from being restrained from unlawfully misappropriating funds and exercising control over LTYC's property and accounts and crippling LTYC's ability to operate its business.

WHEREFORE, Plaintiff requests that this Court:

a. Permanently enjoin Defendants from holding themselves out to be LTYC employees, officers, or agents.

    b.  Enjoin Defendants from accessing any LTYC financial accounts, benefits accounts, computer systems, email accounts, confidential information, or social media accounts.

    c.  Order Defendants to return any company property and data files obtained during their employment with LTYC, including confidential and proprietary information.

    d.  Order Defendants to produce a complete list of their usernames and passwords or other information providing them with access to all LTYC financial accounts, benefits accounts, computer systems, email accounts, confidential information, or social media accounts.

Dated: May 20, 2022					Respectfully submitted,


							*/s/ Frank R. Laws*
							Frank R. Laws, Esq. (Bar No. 02596)
							flaws@tandllaw.com
							Jennifer Ciarrocchi (Bar No. 20101)
							jciarrocchi@tandllaw.com
							THOMAS & LIBOWITZ, P.A.
							25 S. Charles Street
							Suite 2015
							Baltimore, Maryland 21201
							Tel:	410-752-2468
							Fax:	410-752-0979